**E-FILED**
Friday, 27 January, 2012  02:08:59 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |  |
|---|---|---|
| MINOR T.G., *as a minor student*, by MR. | ) | |
| & MRS. T.G., *as Parents and Next Friend,* | ) | |
| *and Each Individually,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-1392 |
| | ) | |
| MIDLAND SCHOOL DISTRICT 7, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on the parties' Cross-Motions for Summary Judgment. (Docs. 95 & 100). Each Motion is fully briefed and ready for disposition. (Docs. 105, 107, 109 & 110). For the reasons stated below, Defendant's Motion for Summary Judgment is granted, and Plaintiffs' Motion for Summary Judgment is denied. Plaintiffs have requested oral argument on the Motions for Summary Judgment. Because the Court finds that it can determine the issues based upon the record and written arguments before it, Plaintiffs' request is denied.

Both parties have asserted in their respective briefs that some aspect of the other party's submissions has been out of compliance with either this Court's Local Rules or the Federal Rules of Civil Procedure, and ask the Court to strike the submissions or portions of them. While the Court notes that some of these complaints are justified, motions to strike are disfavored, and the Court finds, in the interest of efficiency, that these claimed errors do not impair its ability to decide this case on the submissions before it. *Bloomington Partners, LLC v. City of*

*Bloomington*, 04-CV-2287, 2006 WL 2578916, at *8 (C.D. Ill. Sept. 6, 2006) (citing *Fenje v. Feld*, 301 F.Supp.2d 781, 789 (N.D. Ill. 2003); *Sun v. Bd. of Trs. of Univ. of Ill.*, 429 F.Supp.2d 1002, 1030 (C.D. Ill. 2006)) ("best practice is to deny motions to strike related to a motion for summary judgment"). However, the Court cannot rely on statements of fact that are not supported by a citation to evidence, and so will not consider any statements of fact that lack such a citation. *See* Local Rule 7.1(D).

## BACKGROUND[1]

Plaintiff T.G.[2] is a minor disabled student within Defendant school district. On October 16, 2007, Plaintiffs filed a due process complaint with the Illinois State Board of Education ("ISBE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 et. seq., and its accompanying regulations. (Doc. 45 at 14). The complaint alleged that T.G. was not receiving a free, appropriate public education ("FAPE"), and that the school district had discriminated against T.G. because of her family's advocacy efforts. (Doc. 45 at 14). On February 4, 2008, the school district filed its own due process complaint, which was consolidated with Plaintiffs' original complaint. (Doc. 45 at 15). On June 11, 2008, the ISBE appointed Kristine L. Anderson as the Impartial Hearing Officer

---

[1]    Plaintiffs' statements of Undisputed Material Facts in their Motion for Summary Judgment that do not contain citations to evidence (*i.e.*, #88-93) cannot be considered by the Court in deciding the Motions for Summary Judgment. In addition, Plaintiffs dispute Defendant's Undisputed Material Fact #12, but left a blank space in the explanation of their dispute and failed to cite evidence in support of their dispute; this fact is therefore deemed undisputed. (Doc. 107 at 14).

[2]    The parties and the IHO refer to the student using both "TG" and "T.G." In the interest of consistency, the Court will refer to her as "T.G.," and has altered all references and quotations to reflect that spelling.

("IHO") for this case. (Doc. 45 at 14). A five day hearing was held in May and June of 2009, and the IHO issued her decision on July 17, 2009. (AR 346, Doc. 45 at 3-4).

In her decision, the IHO identified three issues in dispute: (1) whether Defendant implemented T.G.'s individualized education program ("IEP") as written, (2) whether Defendant developed IEPs that denied T.G. a FAPE and necessary related services, and (3) whether Defendant's evaluations of T.G. were appropriate and developed properly. (AR 317). The time period relevant to these issues was the second semester of T.G.'s seventh grade year (the 2005-2006 school year), as well as her eighth (2006-2007) and ninth (2007-2008) grade years. The IHO first reviewed the IEPs developed for each of the relevant years, as well as testimony from T.G.'s mother and teachers regarding those IEPs and their implementation. She also discussed a 2006 Domain Assessment Meeting, a 2007 Eligibility Meeting, and evaluations of T.G. (AR 319-37).

The IHO found, based on T.G.'s mother's testimony and the evidence presented, that Plaintiffs were not challenging T.G.'s seventh grade IEP. (AR 319, 82 n. 16). Therefore, she did not discuss that IEP in detail. The Court finds that this assumption by the IHO was reasonable and not erroneous. Even assuming that the implementation of the seventh grade IEP should have been discussed, though, it makes no difference to the outcome of either the IHO's decision or this Court's decision on appeal, as Plaintiffs make the same unsuccessful arguments for the seventh grade IEP as they do for the eighth grade IEP. The Court reviews the seventh grade IEP and its implementation below.

Following her review of the evidence and testimony, the IHO explained the relevant law under IDEA, and stated her conclusions of law. As to the question of whether Defendant had failed to implement T.G.'s IEPs as written, the IHO determined that Defendant had not failed to implement the IEPs. The IHO found that Plaintiffs "did not present any evidence to indicate that th[e] therapist failed to implement T.G.'s speech and language goals." (AR 339). The IHO found that there was a procedural error in the implementation of the social work goal for the 2007-2008 year, but that, because the error did not result in the denial of educational benefit, it was not a denial of FAPE: Ms. Willemborg (a school social worker) implemented the IEP's goal, and used individual, rather than group, therapy because she thought they would be better for T.G. (AR 339). T.G.'s special education teacher testified that she implemented the IEP goals during the ninth grade year, though she was unsure whether the assistive technology goal was met. The IHO found that this uncertainty was merely due to the teacher's lack of knowledge of whether T.G. completed assignments at home; though she did not follow up with T.G.'s parents about this, it was not a failure to implement the IEP since the parents did not present any evidence indicating that T.G. thereby failed to benefit from her education. Moreover, the record showed the T.G. made educational progress during that year. (AR 339).

The IHO next turned to whether Defendant's IEPs for T.G. provided her a FAPE and the necessary related services to allow her to benefit from her special education. First, she noted that whether parents are involved in crafting the IEP is an important factor in deciding whether the IEP is appropriate, and found that

T.G.'s parents were "active and influential" in developing T.G.'s IEPs. (AR 340). Notably, her parents "did not disagree with any facet of" the eighth grade IEP, and "did not disagree with any of the [ninth grade IEP] team's decisions concerning placement, goals, accommodations or modifications, or related services." (AR 340).

The IHO also found that the eighth grade IEP's goals were properly developed to address T.G.'s deficits, including academics, life skills, speech and language, reading, written expression, and math. (AR 341). T.G.'s occupational therapy was provided on a consultative basis, which was approved both by T.G.'s mother and Defendant's subsequent evaluation. T.G. was also provided with assistive technology; though her parents believed that she should have been provided more assistive technology, they did not provide credible evidence that her progress was hindered by a lack of assistive technology. (AR 341). The IHO found that T.G. received educational benefit from her IEP during her eighth grade year, as shown by the testimony of her teachers and the increase in her time in mainstream classes during ninth grade. (AR 341).

For the ninth grade year, the IHO found that the IEP's goals were sufficient for all areas except reading and writing. (AR 341). She noted that Dr. Rudy Lorber (Plaintiffs' neuropsychological consultant), school psychologist Muskopf, and Ms. Ghighi (T.G.'s ninth grade special education teacher) all believed T.G. should have received more reading and writing instruction, and that it appeared from the hearing testimony that T.G.'s parents preferred to have T.G. use assistive technology such as books on tape to address her reading and writing deficits. As these accommodations are not a substitute for improving the student's reading and

writing, the lack of reading and writing goals constituted a denial of a FAPE for T.G. (AR 341-42). Defendant also failed to provide an appropriate vocational assessment for T.G. (AR 342).

Finally, the IHO considered whether Defendant's speech language, occupational therapy, and assistive technology evaluations were appropriate, such that it did not have to reimburse Plaintiffs for their private evaluations, and found that they were. The IHO also found that Defendant did not have to reimburse Plaintiffs for Dr. Lorber's involvement in the case, because they failed to raise the issues of Dr. Lorber's evaluation or their request for reimbursement in their due process complaint, and because they did not allow Defendant to evaluate T.G. until after Dr. Lorber's evaluation was completed. (AR 343-42).

The IHO then denied Plaintiffs' requests for a finding that Defendant violated their procedural rights and denied them the right to participate, for a finding that Defendant denied T.G. a FAPE for the 2005-2006 and 2006-2007 school years, for a finding that Defendant failed to implement T.G.'s IEPs, for a finding that Defendant failed to offer T.G. appropriate related services, for an order of specific individual compensatory services, and for a finding that they were the prevailing party. (AR 344-46). The IHO granted Plaintiffs' request for a finding that the District denied T.G. a FAPE during 2007-2008 by failing to provide her with appropriate IEP goals to address her reading deficits, by failing to provide her with appropriate IEP goals to address her deficits in the area of written expression, and by failing to administer a vocational evaluation that appropriately identified T.G.'s vocational needs, which precluded Defendant from creating a meaningful transition

plan for her. (AR 344). The IHO also granted Plaintiffs' request for a finding that the district failed to utilize specially designed instruction solely as to the District's failure to provide T.G. with appropriate reading instruction for the 2007-2008 school year. (AR 345).

The IHO ordered the school district to convene an IEP meeting to create a goal or goals to address T.G.'s reading deficits using a specially designed, multisensory reading approach. (AR 345). She also ordered Defendant to provide T.G. with no less than two hours a week of reading instruction utilizing a research based multisensory approach, provided by an instructor who is trained in teaching that method, before or after school, beginning within 30 days of the first day of the 2009-2010 school year; and to provide her with no less than one hour a week of written language instruction in addition to scheduled classroom instruction, utilizing a specially designed approach selected by the team. (AR 345). The IHO ordered Defendant to retain a certified vocational evaluator such as James Boyd (Plaintiffs' private vocational consultant) or another comparably-qualified person, to administer an appropriate vocational evaluation of T.G., and then to convene an IEP meeting to the results and draft appropriate transition goals; Defendant was to provide vocational counseling if so recommended by the evaluator. (AR 345). Finally, the parties were ordered to convene an IEP meeting within two weeks to draft a new IEP for T.G., in light of the IHO's order, and to provide proof of compliance to the ISBE by August 21, 2009. (AR 346).

Plaintiffs filed their appeal in this Court on November 23, 2009. (Doc. 1). Plaintiffs amended their Complaint several times, each in response to Defendant's

Motions to Dismiss. On September 29, 2010, the Court denied Plaintiffs leave to file yet another amended Complaint, and granted Defendant's Motion to Dismiss Counts IV, V, and VI of Plaintiff's Third Amended Complaint. (Doc. 81). After the Court's September 29, 2010 decision, only the first three counts of Plaintiff's Third Amended Complaint remained: a request for a "permanent injunction for deprivation of federal rights secured by IDEA in violation of [28 U.S.C.] § 1983," a partial appeal of the IHO's final order, and a request for attorney's fees under the IDEA.[3] (Docs. 45 & 81). The parties seek summary judgment on these claims in the instant Motions.

---

[3]    The essence of this case is Defendant's compliance with the IDEA and the IHO's final order. Plaintiffs' § 1983 claim for a permanent injunction and their request for attorney's fees both turn on whether the IHO's final order was proper. If Plaintiffs' claim that Defendant violated the IDEA is denied, then Plaintiffs cannot succeed on their § 1983 claim for a permanent injunction under it. Similarly, their right to attorney's fees turns on their status as "prevailing parties" below, which is also informed by the substance of their IDEA appeal. Therefore, the issues relating to the merits of Plaintiffs' appeal of the IHO's final order will be discussed first, and the Court will then turn to the attorney's fees and permanent injunction issues.

## DISCUSSION[4]

Though the instant Motions are brought as motions for summary judgment, where there is no new evidence presented to the district court, "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997) (quoting *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994)). The Court "shall receive the records of the administrative proceedings [and] shall hear additional evidence at the request of a party."[5] 20

---

[4]      Plaintiffs' briefs are extremely disorganized (and out of compliance with this Court's Local Rules' content and page limit requirements for summary judgment submissions), and are filled in places with conclusory statements, rather than legal analysis; there are also a number of pages, for example, pages 14 and 15 of their Motion for Summary Judgment, on which Plaintiffs left blank spaces, clearly having forgotten to fill in needed information. In addition, Plaintiffs' Response to Defendant's Motion for Summary Judgment cites to Plaintiffs' own Motion for Summary Judgment and its exhibits, and their Memorandum in Opposition to Defendant's Motion for Summary Judgment cites to the Response, adding to the confusion; each Motion for Summary Judgment should be independently briefed, though the documents cover the same issues, and Memoranda should contain the party's legal analysis. Finally, many of Plaintiffs' statements of fact contain legal argument, which is inappropriate. However, as these are the only place where some of Plaintiffs' arguments are presented, the Court will consider them. It is Plaintiffs' responsibility to clearly present their arguments, otherwise they run the risk that the Court will not unearth the intended truffle that might carry the day. "Judges are not like pigs, hunting for truffles buried in briefs," and are not required to search the records for additional arguments that might benefit a party. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Having so spoken, the Court has done its best to discern Plaintiffs' arguments and, in doing so, has attempted to impose some sort of structure on the issues, while addressing each of Plaintiffs' apparent arguments.

[5]      Because of the requirement that the Court receive the administrative record and base its decision on the preponderance of the evidence, including the record, Plaintiffs' claim that Defendant's statements of fact citing to the administrative record should be stricken is mistaken. Though the parties must point to the particular pieces of evidence that support their arguments, as in an ordinary motion for summary judgment, the administrative record is already a part of the docket in

U.S.C. § 1415(i)(2)(C)(i), (ii). "Accordingly, despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence, not on whether there are any genuine issues of material fact." *Todd v. Duneland School Corp.*, 299 F.3d 899, 904 (7th Cir. 2002) (citing 20 U.S.C. § 1415(i)(2)). No matter who files a Motion for Summary Judgment in a case like this, "[t]he party challenging the outcome of the state administrative decision bears the burden of proof." *Id.* Here, that means that Plaintiffs bear the burden of proof.

On January 28, 2011, the Court allowed the parties to conduct discovery and submit additional evidence as to two limited issues: the qualifications of Ms. Katie Lehnert,[6] a speech paraprofessional, and Defendant's compliance with the IHO's Final Decision & Order. (Doc. 90). In so limiting the evidence introduced by the parties, the Court was careful "not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*." *Monticello School Dist. No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996) (quoting *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984)).

## I.    IHO's Decision

In reviewing a § 1415(e)(2) appeal, the Court must give "due weight" to the administrative agency, and refrain from substituting its own views of proper educational methods. *Bd. of Educ. of Murphysboro v. Illinois State Bd. of Educ.*, 41

---

this case, unlike in an ordinary summary judgment situation, in which the evidence gathered by the parties is not automatically filed with the Court and part of the case record. It is thus appropriate both for Defendant to cite to it and for the Court to rely on it.

[6]    In its earlier Order & Opinion, the Court noted that the parties could not agree on how Ms. Lenhert's name should be spelled. Submissions from Plaintiff now indicate that "Lenhert" is the appropriate spelling, and so the Court will use this spelling throughout. (Doc. 100, Ex. 6 at 10).

F.3d 1162, 1166 (7th Cir. 1994). In addition, when no new evidence is heard by the court, "the district judge owe[s] the administrative law judge's decision the usual deference that reviewing courts owe agencies when judicial review is limited to the administrative record." *School Dist. of Wisconsin Dells v. Z.S. ex rel. Littlegeorge*, 295 F.3d 671, 675 (7th Cir. 2002) (citing *Dale M. ex rel. Alice M. v. Board of Education*, 237 F.3d 813, 815-16 (7th Cir. 2001); *Morton Community Unit School District No. 709 v. J.M.*, 152 F.3d 583, 587-88 (7th Cir. 1998).

> [A] reviewing court that has before it evidence not considered at the administrative level will naturally defer less to the administrative decision, as it has an information advantage over the administrator that it lacks when judicial review is limited to the record that was before him. Judicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have.

*Id.* (citing *Dale M.*, 237 F.3d at 816; *Ojai Unified School District v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993); *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)). Where no, or only insignificant, new evidence is taken, the "clear-error or substantial-evidence standard" applies. *Id. See also Alex R. v. Forrestville Valley Comm. Unit Sch. Dist. No. 221*, 375 F.3d 603, 612 (7th Cir. 2004) (citing *School Dist. v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002)) ("[W]here the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.' This level of review is akin to the standards of clear error or substantial evidence.")

Here, the Court has allowed additional evidence as to two issues: the qualifications of Ms. Lehnert, a speech paraprofessional working for Defendant, and

Defendant's compliance with the IHO's Final Decision & Order. (Doc. 90). Neither of these is significant insofar as the substance of the Court's review of the IHO's decision is concerned. The Court allowed Plaintiffs to conduct discovery and present evidence on the qualifications of Ms. Lehnert, who provided T.G. with speech and language therapy during the 2006-07 school year under the supervision of Ms. Grandsart (Defendant's speech language pathologist); her qualifications might be relevant to the question of whether the IHO was correct in her ruling that Defendant provided T.G. appropriate speech and language services. (Doc. 90 at 7-8). However, Plaintiff has put on no evidence that Ms. Lehnert was not properly qualified to provide services to T.G. to undermine the IHO's implicit finding that she was so qualified and provided services appropriately; this matter is discussed further below.[7] Likewise, as explained further below, the additional evidence as to Defendant's compliance with the order concerns Plaintiffs' § 1983 claim for an injunction forcing Defendant to comply with the IHO's final order, not the substance of the final order itself; the Court does not rely on it in its instant review of the IHO's final order. Therefore, a substantial amount of deference is due to the agency decision.

Plaintiffs argue that the IHO's decision is due no deference by this Court, as it is full of alleged legal and procedural errors, citing to *Morton Community Unit School Dist. No. 709 v. J.M.*, 152 F.3d 583, 587 (7th Cir. 1998) and *Dale M.*, 237

---

[7]     Plaintiffs complain that the ISBE refused, because it was no longer a party to this case, to respond to their interrogatories and requests to produce information about Ms. Lehnert's qualifications. (Doc. 100 at 14-15; Pltfs. Exs. 6 & 7). However, it appears from the docket in this case that Plaintiffs made no effort to subpoena this information from the ISBE or from Defendant. It is Plaintiffs' burden to put on evidence calling into question the IHO's findings.

F.3d at 817. It is true that the Court reviews the IHO's statements and application of law de novo, but the analysis of facts in light of education law, so long as the law is not misstated or misunderstood, is the province of the expert agency, and this Court will grant its conclusions "due weight." The Court finds that many of Plaintiffs' complaints about the IHO's decision are disagreements with her analysis of the evidence and her conclusions, not true legal errors that would justify the Court's giving no deference to the IHO's decision. Plaintiffs also specifically argue that the IHO committed a number of procedural errors, which the Court assumes are what underlie their claim that the decision is due no deference. The Court disagrees that the IHO committed procedural errors of the magnitude required to undermine the decision, and discusses these alleged errors below.

### A.      IHO's finding that Defendant provided a FAPE to T.G.

Public schools must provide a disabled student with a FAPE designed to meet her individual needs. "[A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County, et al. v. Rowley*, 458 U.S. 176, 206-07 (1982). Procedural errors by a school district will not undermine its provision of a FAPE unless they "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the

provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

### 1.  Appropriateness of IEPs

In her final decision, the IHO found that Defendant provided a FAPE to T.G. in all but one of the years of schooling at issue. Plaintiffs complain that the IHO wrongly found that Defendant provided a FAPE to T.G. in the seventh and eighth grades, claiming in part that she "ignored substantial evidence" that the IEPs for those years were inappropriate. They argue that there were

> no goals for reading and writing, no objective [present levels of performance] or non-subjective measures of progress in goals, no direct instruction in reading or writing, no individualized goals responsive to [T.G.'s] unique needs, progress reporting that was subjective and undocumented, and inadequate related services in [speech language], [occupational therapy] and [assistive technology] to allow her to benefit from her special education, including illegally and inappropriately provided SL services to T.G. in the 2006-2007 school year with an aide who was not a speech and language pathologist and not approved by the ISBE to provide services to students with disabilities and should not have been providing services to T.G. who had severe speech and language deficits and specifically without the parents' knowledge.

(Doc. 107 at 5; Doc. 100 at 4). Plaintiffs direct the Court's attention to a Second Circuit case, but it is of no help to their argument, as it holds that "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Central School Dist.*, 346 F.3d 377, 382 (2nd Cir. 2003). All but the last of the complaints listed above are about "the sufficiency of goals and strategies in an IEP," and the Court will thus defer to the IHO's determinations to the extent they

are supported by the evidence, they are discussed in more detail below. The last item, relating to Defendant's use of Ms. Lehnert to provide services to T.G., is discussed along with Plaintiff's complaints related to the implementation of the IEPs. Finally, to the extent Plaintiffs complain that the alleged "inadequacy" of the IEPs' speech and language, occupational therapy, and assistive technology accommodations and goals were due to Defendant's reliance on its (allegedly inadequate) evaluations of T.G. in those areas, this argument is rejected, as the Court determines below that Defendant's evaluations were appropriate. The IHO's conclusions on these points are discussed below.

As noted above, an IEP must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. The child's IEP must be "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Id*. at 188-89. However, the school district is not required to provide the best possible education or "maximize the potential of handicapped children." *See id*. at 189, 197 n. 21, 198, 199; *Heather S.*, 125 F.3d at 1057. Moreover, "proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the [IDEA]." *Kerkam v. McKenzie*, 862 F.2d 884, 886 (D.C. Cir. 1988) (citing *Rowley*, 458 U.S. at Id. at 189, 197 n. 21, 198, 199). If the student "is being educated in the regular classrooms of the public education system, [the IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204. While a parent's failure to object to an IEP does not waive their right to challenge it, "casts significant doubt

on their contention that the IEP was legally inappropriate since it suggests that the parents were also unaware prospectively that the…IEP was unlikely to confer educational benefit." *Carlisle Area School v. Scott P. By and Through Bess P.*, 62 F.3d 520, 536 n. 8 (3rd. Cir. 1995). "The IDEA creates a presumption in favor of a school district's educational plan, placing the burden of proof, by preponderance of the evidence, on the party challenging it." *R.H. v. Plano Independent School Dist.*, 607 F.3d 1003, 1010-11 (5th Cir. 2010) (citing *Salley v. St. Tammany Parish Sch. Bd.*, 57 F.3d 458, 467 (5th Cir.1995)).

### a.     Seventh Grade (2005-2006)

The IHO found that Plaintiffs "failed to present any credible evidence to indicate that the District failed to provide T.G. with an appropriate IEP" for seventh grade. (AR 319). She noted that Plaintiffs called as witnesses two of T.G.'s seventh grade teachers, both of whom testified that T.G. passed her classes, science and social studies, and received educational benefit from them. (AR 319). The IHO also found that Plaintiffs were "active and influential members of the IEP team," and that they successfully requested that T.G. be placed in regular (not special education) science and social studies classes. (AR 319). She noted that the parents did not express their concerns about the school's provision of services at the time of the IEP process or during the seventh grade year. (AR. 320).

Plaintiffs now complain generally that the IEP did not contain reading and writing goals, objective measures of progress, a requirement of direct instruction in reading and writing, individualized goals, or proper progress reporting, and that it did not contain adequate speech and language, occupational therapy, and assistive

technology goals and accommodations.[8] The Court has reviewed T.G.'s seventh grade IEP, and finds that it does contain reading and writing goals (AR 525, 532), objective measures of progress, including a record of her present levels of performance[9] (AR 524-32), individualized goals (AR 524-32), and methods of progress reporting (AR 524-33). Further, there does appear to be a requirement that T.G. receive direct instruction in reading and writing (listed as "English/spelling"). (AR 535). Finally, there are speech and language, occupational therapy, and assistive technology goals and accommodations, and no evidence that these were inappropriate. (AR 529-33, 535, 541).

---

[8]    Plaintiffs also argue that the IHO ignored their evidence that T.G. regressed in reading during her seventh grade year; they rely on the "IEP Analysis" from Basha Ontiveros, their speech and language expert. (Doc. 100 at 28 (citing AR 592-93, 606, 1554-72)). As discussed further below, Ms. Ontiveros' "IEP Analysis" covers academic areas outside her speech and language pathology expertise, and neither the IHO nor the Court considers it competent evidence as to the adequacy of T.G.'s IEPs in areas other than speech and language. Plaintiffs also cite a portion of testimony from T.G.'s math teacher, which did not contain any testimony regarding her reading skills. (AR 1554-72).

[9]    In support of their argument, Plaintiffs rely on testimony from Jean Kulcyzk (their private educational consultant), whose testimony concerned the formal requirements of the IEP, rather than its substance. (AR 2027-39). Ms. Kulcyzk testified that the seventh grade IEP did not contain the documentation to support the baseline assessment of T.G.'s reading ability; the IEP showed T.G.'s present level of reading performance was at a certain level, but that it didn't show the source of that measurement. (AR 2037-39). Reviewing this IEP, the Court finds that Ms. Kulcyzk was correct in noting that the IEP does not specify the source of the numerical levels given in the "statement of present levels of performance," but there is no indication that the IEP is per se inappropriate simply because of that.
    Indeed, it appears from reading the "statement of present levels of performance" along with the "goal statement" that both statements contemplate using the Woodcock-Johnson test as the assessment tool. (AR 525). Ms. Kulcyzk, in opining that the IEP compared "apples to oranges," jumped to the conclusion that the "statement of present levels of performance" numbers did not come from the Woodcock-Johnson test prescribed in the "goal statement," but the more reasonable assumption is that both measures would use that test.

As noted by the IHO, the notes from the IEP meetings reflect the parents' involvement and influence on the team; though the academic members of the team felt that T.G. would benefit from special education science and social studies classes, her parents preferred mainstream classes with extensive accommodations, and that is reflected in the IEP developed by the team. (AR 535, 537-540). Moreover, there is no evidence that Plaintiffs objected to the IEP that was developed, indicating that they agreed with school officials that it was "reasonably calculated to provide educational benefit." Finally, T.G. did achieve passing grades in her classes and progress to the next grade, which indicates that the accommodations made in her mainstream classes were sufficient to allow her to achieve the educational level required by them. As noted above, the Court defers to the IHO's findings, which are supported by the record, and finds that her conclusion that Plaintiffs failed to carry their burden of proving that the seventh grade IEP was inadequate was reasonable.

### b.    Eighth Grade (2006-2007)

The IHO found that, though it was not perfect in every way, the eighth grade IEP developed for T.G. was appropriate. Plaintiffs now complain, as they do regarding the seventh grade IEP, that the eighth grade IEP did not contain reading and writing goals, objective measures of progress, a requirement of direct instruction in reading and writing, individualized goals, or proper progress reporting, and that it did not contain adequate speech/language and occupational

therapy goals and accommodations; they therefore argue that the IHO's decision that the IEP was adequate was unreasonable.[10]

In explaining her decision, the IHO recounted Mrs. G's (T.G.'s mother) testimony regarding the eighth grade IEP process. Mrs. G testified that she didn't believe the IEP's goals focused on life skills were appropriate, but conceded that she did not share this concern with the team. The IHO found that those goals were justified, especially given Ms. G's identification of them as areas of concern for T.G. in Dr. Lorber's private evaluation. (AR 320). The IHO also noted the specific goals, modifications, and accommodations required by the IEP, as well as the notes of the IEP team's meetings. These notes indicate Mrs. G's "very active role in the meeting," especially concerning her questioning of district staff as to T.G.'s reading instruction and her agreement that T.G. should receive occupational therapy services on a consultative basis. (AR 321, 340). Finally, the IHO noted that the IEP team, including T.G.'s parents, agreed as to the content of the IEP, and that T.G.'s parents' later written comments only addressed T.G.'s issue with head lice, not the content of her IEP. (AR. 322, 340).

Plaintiffs' first complaint is that the IEP lacked reading and writing goals. As to the reading goals, the IHO noted that, though the IEP's special educational goals were mostly clear and measurable, the goal labeled "reading comprehension" did

---

[10] Plaintiffs rely heavily on the IEP Analysis presented by Basha Ontiveros (Plaintiffs' speech and language consultant), and argue several times that the IHO ignored this evidence. To the extent Plaintiffs rely on Ms. Ontiveros' opinions as to matters outside her speech and language pathology expertise, the Court agrees with the IHO that her opinion is not competent evidence that the IEPs were inappropriate. The Court considers Ms. Ontiveros' Analysis and testimony only as they relate to speech and language therapy issues.

not appear to require T.G. to actually read, but merely to listen to a story and answer questions about it. (AR 322). Plaintiffs assert that this means there was no reading goal. Ms. Deffenbaugh (T.G.'s eighth grade special education teacher) testified that both T.G.'s listening and reading comprehension skills increased as the "reading comprehension" goal was implemented. (AR 322). The IHO found that, though this goal was not properly written, T.G. made progress with reading comprehension and that the IEP therefore provided educational benefit to her. (AR 322-23). The Court finds that this was a reasonable determination of educational policy that is supported by the evidence; there was therefore an adequate reading goal that provided an educational benefit to T.G..

Plaintiffs also assert that their expert's analysis proved that the IEP's writing goal was not "meaningful" because it did not include a "quantified or measurable" goal, arguing that the "subjective" evaluation by the teacher did not comply with the IDEA's requirement of "objective measurement of progress."[11] (Doc. 100 at 23-24). Plaintiffs do not explain what an appropriately objective measurement of writing progress would be, and the Court does not find that having a teacher evaluate a student's progress on a numerical scale, as provided by the IEP, is improperly subjective. Writing is not a discipline that can truly be

---

[11] In support of the claim that the writing goal was "not meaningful as a goal," Plaintiffs cite the IEP analysis by Ms. Ontiveros, Plaintiffs' speech and language consultant. (AR 607). The Court has reviewed the cited portion of the report. First, most of it does not concern the eighth-grade IEP, which is what Plaintiffs are attempting to condemn. Further, the only reference to the eighth-grade IEP relates to reading, not writing. Finally, as noted above, the IHO found that Ms. Ontiveros' report and testimony often strayed from her area of expertise into other subjects; this is one of these other subjects, and the Court would not find her opinion of the IEP's writing goals to be helpful in assessing the IEP in any event.

quantified, as a content-based subject, such as history or mathematics, might be; writing does not lend itself to multiple-choice tests. It is not unreasonable to provide for a teacher to qualitatively measure a student's writing, and, indeed, the Court does not see any other means of measuring progress in writing skills. Plaintiffs also complain that the IEP did not contain "direct instruction in writing" and improperly substituted an assistive technology goal in place of a writing goal, but they do not elaborate on any evidence that direct writing instruction was required in order to provide educational benefit, or specify what the supposedly improper "assistive technology" goal was. (Doc. 100 at 24).

Dr. Lorber conducted a neuropsychological[12] evaluation of T.G. in September 2006. (AR 464-88). Defendant, pursuant to 34 C.F.R. 300.502(c), and as explained further below, considered Dr. Lorber's report in its February 15, 2007 eligibility meeting addressing the results of T.G.'s triennial review. Plaintiffs now complain that Defendant "failed to change any goals in the IEP" upon consideration of Dr. Lorber's report. (Doc. 100 at 29). The IHO found that the team made ten additional modifications and adaptations to T.G.'s IEP, "several of which were taken directly from Dr. Lorber's recommendations," but "did not add to or change any of T.G.'s IEP goals." (AR 325). The fact that none of the goals were changed as a result of Dr. Lorber's report does not itself indicate that the IHO was wrong to find that the IEP was appropriate. Indeed, the IHO herself explicitly noted that none of the goals were changed, and found nothing wrong with that, showing that she was aware of

---

[12]   Dr. Lorber's evaluation is referred to variously as "neurophysical" and "neuropsychological." His report and the IHO's decision use the term "neuropsychological," so that is what the Court will use. (AR 464, 343)

the fact. Plaintiffs only state that Dr. Lorber's information would "justify changes to the IEP," citing to his entire report; Plaintiffs fail to state what additional changes should have been made. As the IHO found, the team considered Dr. Lorber's report, and made several changes to the IEP because of it. The mere fact that none of the goals themselves were changed does not alone indicate that the IHO erred in finding that the IEP provided a FAPE to T.G..

Another charge of Plaintiffs' is that the IEP did not contain individualized goals, but the Court has reviewed the IEP and finds no reason to believe that the goals it contains were not "individualized" to T.G.'s needs; Plaintiffs cite no evidence that they were not. Similarly, Plaintiffs complain that the IEP did not contain baseline data from which to measure T.G.'s progress. (Doc. 100 at 24-25). The Court finds that the IEP does indicate T.G.'s baseline status for each goal, such that progress can be measured.[13] (AR 401-11). Plaintiffs have no evidence that the baselines in the eighth-grade IEP were somehow unreliable or improper. The only evidence they point to is testimony from Ms. Ontiveros that the speech and language goal, which was to be able to verbally express several grammatically correct sentences describing pictures, was a "very general unmeasurable goal," because it does not specifically state how many words the sentences were to have, nor in what tense the sentences were to be. (AR 1421). The Court does not find

---

[13]     Plaintiffs claim that the reading goal does not contain baseline data. (Doc. 100 at 24). On the contrary, the reading goal states the results of T.G.'s reading comprehension and reading vocabulary testing, as well as that she can follow along while an adult reads and can recall "simple plot, character, and setting after class discussions." (AR 401).

Further, Plaintiffs assert that the IHO erred in stating that Ms. Deffenbaugh kept records of T.G.'s progress during the eighth grade. The IHO cited Ms. Deffenbaugh's monthly records; which do appear to be complete. (AR 323, 496-73).

these goals to be vague or unmeasurable, and notes that the statement of T.G.'s present levels of performance is clear in stating that T.G. had trouble with certain pronoun and auxiliary verb usage. (AR 92). These arguments do not compel the reversal of the IHO's conclusions.

Finally, Plaintiffs assert that the IEP did not contain adequate speech/language and occupational therapy goals and accommodations to allow T.G. to benefit from her education. (Doc. 100 at 25-26). The IHO found that the IEP provided that T.G. was to receive 70 minutes a week of speech/language therapy; she noted that Ms. Grandsart testified that this was an appropriate amount of therapy time for T.G.. (AR 323). The IHO also found that two of the three speech/language goals "describe T.G.'s present levels of performance and are clearly stated and measurable." The third goal, focusing on expressive language skills, described T.G.'s specific deficits and had objectives clearly relating to them, but failed to "expressly address the deficits listed in T.G.'s present level of performance." (AR 323-24). However, the IHO found that the eighth grade IEP, including the speech/language aspects, "appropriately addressed T.G.'s deficits." (AR 341). Plaintiff's arguments against the IEP's speech/language goals and accommodations rely entirely on the argument that Defendant should have used Ms. Ontiveros' evaluations and recommendations, rather than its own, but, as explained further below, the IHO properly found that that Defendant was entitled to rely on its own evaluations, which were appropriate. The IHO thoroughly considered the evidence presented by Plaintiffs, including Ms. Ontiveros' report and testimony, and reasonably concluded that the IEP's speech/language goals and

accommodations were appropriate, which is a matter of educational expertise on which the Court defers to the IHO's reasonable determination.

As for occupational therapy, the IEP provided T.G. with 10 minutes of occupational therapy services, on a consultative basis, per week; as noted by the IHO, Mrs. G agreed that T.G. should continue to receive occupational therapy services on a consultative basis. (AR 321). The IHO also found that Defendant's occupational therapy evaluation of T.G. bore this out. (AR 341). Plaintiffs complain that their occupational therapy expert, Linda Marshall-Kramer, recommended additional services, and that Defendant should have included them in the eighth grade IEP. (Doc. 100 at 26). As explained further below, Defendant was entitled to rely on its own occupational therapy evaluation. Again, the IHO considered and discussed the evidence presented by Plaintiffs, including Ms. Marshall-Kramer's testimony, and reasonably concluded that the IEP provided a FAPE to T.G.. Without doing more than simply pointing to Ms. Marshall-Kramer's opinion, Plaintiffs cannot show that the IHO was unreasonable in her determination.

For the reasons stated above, none of Plaintiffs' specific complaints about the eighth-grade IEP show that the IHO was unreasonable in finding that it was appropriate. It is undisputed that T.G.'s parents were actively involved in the IEP process; the evidence shows that their suggestions and concerns were influential in the IEP team's decisions, and that they did not express their disagreement with the IEP when it was being developed. The participation and agreement of the parents in the IEP's development is an important consideration in determining the appropriateness of an IEP. None of the complaints by Plaintiffs cites evidence or

law showing the IHO to have made unreasonable factual findings or errors of law. The factual findings by the IHO are supported by the record, she made no misstatements of the law, and given the presumption in favor of the IEP at both the administrative and review level, and this Court's deferential posture toward the IHO's decision, the Court cannot find that the IHO's decision was unreasonable.

### 2.    Implementation of IEPs as written

The IHO found that Defendant properly implemented T.G.'s IEPs for each of the years at issue. The Court has reviewed her findings, and concludes that they are reasonable and supported by the evidence. Plaintiffs make several specific arguments that the IHO's opinion that Defendant properly implemented T.G.'s IEP's was erroneous, but none of them are successful.

Plaintiffs first argue that they "repeatedly complained about the failure of the District to implement the [IEPs'] modifications and accommodations, such as not getting all of T.G.'s textbooks and curricular materials on books on tape, and the lack of laptop availability at home, and _____." [*sic*] (Doc. 107 at 14). This is one of the several places where Plaintiffs have left gaps of both argument and evidence in their briefs; the citation accompanying this statement also includes two blanks that have not been filled in. Even if the Court does consider this claim, which appears to concern the IEPs' assistive technology provisions, the IHO was not unreasonable in finding that the IEPs' assistive technology goals and accommodations were implemented appropriately. The IHO found that prior to the spring of 2007, Defendant had provided T.G. with her science and social studies books on tape as

provided by the IEPs, and that it had tried to provide a laptop, but T.G. had resisted it. (AR 331). In the spring of 2007, the IEP team formed a committee to investigate the use of more assistive technology for T.G., including text to speech, speech to text, and writing assistance products. (AR 332). In the summer of 2007, Defendant purchased software, a laptop computer, and a flash drive, and provided them to Mr. G (T.G.'s father). (AR 332). However, Defendant could not use these products for T.G.'s benefit, as the G family kept them at home for the entire 2007-2008 school year, returning them only in the fall of 2008, when T.G. was trained in using them and did so on a daily basis. (AR 332). From then on, T.G. was restricted to using the laptop and software at school. (AR 332). The IHO found that this rendition of the facts was supported by the testimony of both Mr. Mair, the school principal, and Mr. G, and concluded that, though it "was not possible to discern what actually happened with respect to the [assistive technology] materials, [but] there is no evidence presented to show that T.G.'s progress was hindered by her failure or inability to make full use of the assistive technology." (AR 332). The Court agrees with the IHO's conclusion; Plaintiffs have cited no evidence that the alleged inability of T.G. to use this assistive technology resulted in her being unable to make academic progress, and so the Court cannot find that the IHO was unreasonable in determining that Defendant did not deny a FAPE to T.G. as a result of this. Moreover, there is evidence suggesting that the family unreasonably prevented Defendant's proper utilization of the assistive technology materials by keeping them at home, and that Defendant acted properly in requiring T.G. to keep the laptop at school starting in the fall of 2008, given the family's prior behavior.

Plaintiffs further dispute the IHO's conclusion that T.G. made measurable progress and received an educational benefit from her classes.[14] (Doc. 107 at 13, 16-18). The IHO found that T.G.'s seventh grade teachers, called to testify by Plaintiffs, "testified that T.G. received the modifications and accommodations required by her IEP, that she passed their classes, and received an educational benefit from them." (AR 319) The Court has reviewed the transcript, and finds that these teachers did so testify, and that this is thus a reasonable conclusion. (AR 1528, 1649, 1652).

For her eighth grade year, the IHO found that T.G.'s reading comprehension and "educational priorities" goals were somewhat flawed, but, as explained elsewhere in this opinion, they allowed T.G. to attain educational benefit when implemented, as shown by Ms. Deffenbaugh's testimony. (AR 322-23). Ms. Deffenbaugh and Mr. Mikesell (T.G.'s seventh grade science and social studies, and eighth grade history teacher) both testified that T.G. received the services laid out by her IEP and received educational benefit from her eighth grade education, and the records made on her eighth grade IEP form bear this out. (AR 496-515, 1588, 1592-93, 1616-17). The IHO also noted Ms. Grandsart's testimony that T.G.'s speech and language goals, and that Ms. Lehnert's notes indicated that T.G. "made progress, but did not master every [speech and language] objective." (AR 323, 512-77). The Court thus finds that the IHO's conclusions that the IEP was implemented properly and that T.G. made educational progress during her eighth grade year were reasonable and supported by the evidence.

---

[14]    To the extent Plaintiffs' complaints on this front include her speech/language therapy and instruction, they are addressed in the part of this section, below, dealing specifically with speech/language.

As noted above, the IHO found that T.G.'s ninth grade IEP was not adequate because it did not include proper reading and writing goals, but found that T.G. made educational progress during that year anyway. (AR 334, 339). Ms. Ghighi testified that T.G. met three of the four goals for which Ms. Ghighi was responsible, and that she succeeded in her classes; Ms. Aldrich (T.G.'s ninth grade math teacher) testified that T.G. succeeded in her math class that year, and that she had recommended that T.G. take pre-algebra the next year. (AR 334). Notably, Ms. Ghighi testified that T.G. was in mainstream classes for all of her academic subjects, with a teacher aide's assistance for science and social studies, and with Ms. Ghighi co-teaching the math and English classes. (AR 334).

The IHO found that Defendant had implemented each of the IEPs as written, and that T.G. had received educational benefit from them.[15] In their attempt to contradict the evidence of progress and educational benefit, Plaintiffs point to their experts' opinions as to T.G.'s achievement, and to the fact that T.G. did not achieve every goal set out for her.[16] However, under *Rowley*, "the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit." 458 U.S. at 207 n. 28. Defendant has shown that T.G. did pass her classes and progressed from one grade to the next. Plaintiffs have

---

[15]   Of course, as noted, T.G.'s ninth grade IEP was found to be deficient in reading and writing, but the IHO found that it was fully implemented as written, and that T.G. received educational benefit from the other goals and accommodations it contained.

[16]   To the extent Plaintiffs rely on the alleged deficiencies of the IEPs or Defendant's evaluations of T.G. to argue that T.G. did not receive educational benefit, these arguments are rejected for the same reasons explained in the sections of this opinion dealing with the appropriateness of the IEPs and of Defendant's evaluations.

pointed to no evidence that this is not true. Moreover, Defendant has pointed to the testimony of T.G.'s teachers and written records, which also supports the IHO's conclusion. The IHO's conclusion that T.G. received educational benefit from the implementation of her IEPs is therefore supported by the record and reasonable, especially considering *Rowley*'s rule that "the achievement of passing marks and advancement from grade to grade" is an "important factor." *Id*.

Plaintiffs' most specific complaints under the issue of the implementation of the IEPs concern Defendant's provision of services to T.G. under the 2006-2007 IEP through Ms. Lehnert, a speech paraprofessional who worked under Ms. Grandsart's supervision. The IHO implicitly found that this was a proper choice to implement the IEPs relating to T.G.'s speech and language education, as she determined that Defendant did properly implement the IEPs in that area. (AR 323-24, 339). The IHO detailed Ms. Grandsart's close supervision of Ms. Lehnert's work, both in and out of the classroom. (AR 323). Plaintiffs claim that Ms. Lehnert was not properly qualified to provide speech and language services, and that Defendant did not adhere to the ISBE Guidelines for Use of Speech and Language Paraprofessionals. (Doc. 107 at 5, 17; Doc. 100 at 14-15). As noted in the Court's previous Order & Opinion, Principal Mair testified at the hearing that Ms. Lehnert was qualified, but he based his knowledge upon information he learned from Julie Albers, the administrator in charge of hiring speech and language aides, who was not called to testify. (AR 988-91). Ms. Grandsart and Mrs. G also both testified, but they each apparently lacked personal knowledge of Ms. Lehnert's qualifications, though Ms.

Grandsart did testify that Ms. Lehnert was registered with the ISBE. (AR 323, 1348-49, 1968).

Because there was no conclusive, first-hand evidence in the record as to her qualifications, the Court allowed Plaintiffs to attempt to discover and present such evidence.[17] (Doc. 90 at 8). Plaintiffs were unable to produce anything other than a fax from Defendant requesting approval of Ms. Lehnert, and a printout of Ms. Lehnert's credentials, indicating that Ms. Lehnert was approved as a "pilot speech and language" and teacher aide.[18] (Doc. 100, Ex. 6 at 9-10). As Plaintiffs have failed to show that the IHO erred in her finding that Ms. Lehnert was qualified to provide services to T.G. under Ms. Grandsart's supervision, they have failed to carry their burden; there is no basis on which the Court can find that the IHO's findings were erroneous. Moreover, the Court does not find the IHO's reliance on Principal Mair's and Ms. Grandsart's testimony to be unreasonable, given Plaintiffs' failure, both at the hearing and before this Court, to provide any evidence questioning Ms. Lehnert's qualifications.[19]

---

[17]    The Court's finding that the evidence in the record was not "adequate" merely supported its determination that a submission of additional evidence by Plaintiff would not be duplicative. (Doc. 90 at 7-8). It was not intended as a ruling on the issue of whether the IHO properly found Ms. Lehnert to be qualified.

[18]    As noted above, the ISBE refused, on the basis that it was not a party to the case, to answer interrogatories or requests for production on this point from Plaintiffs. (Doc. 100, Ex. 6 at 1). However, as also noted above, Plaintiffs failed to attempt to subpoena this information.

[19]    Indeed, the only witness to question Ms. Lehnert's qualifications at the hearing was Mrs. G., T.G.'s mother, and the basis of her complaint about Ms. Lehnert was that neither T.G. nor her other daughter liked Ms. Lehnert. (AR 1962-1969). The IHO heard that evidence, but relied on Mr. Mair's and Ms. Grandsart's

As for the arguments under the ISBE Guidelines that Plaintiffs were not notified in writing that Ms. Lehnert was providing services and that paraprofessionals should not provide services to students with severe deficits, the Court held in its earlier Order & Opinion that Plaintiffs could not introduce the ISBE Guidelines as evidence, as there was no indication that the IHO relied on the Guidelines in her opinion, and the introduction of the Guidelines and deposition testimony supporting them "would threaten to turn this proceeding into a trial de novo as to the question of the ISBE Guidelines['] impact upon whether Defendant provided T.G. with a FAPE." (Doc. 90 at 7). The Court was quite clear that it did not intend to transform the instant proceeding into a trial of the substantive question of whether Defendant provided T.G. with a FAPE, so it is inappropriate for Plaintiffs to attempt to introduce the Guidelines at this stage; this proceeding is limited to determining whether the *IHO's determination* that Defendant provided T.G. with a FAPE is reasonable.[20]

## B.   IHO's order of compensatory education for T.G.

Following from her finding that T.G.'s ninth grade IEP denied her a FAPE in that it failed to set adequate reading and writing goals, as well as to provide an

---

testimony that Ms. Lehnert was qualified and reasonably found that Mrs. G. was not a proper witness to the issue of Ms. Lehnert's qualifications.

[20]   Even if the Court were to review the substantive question of whether Defendant properly implemented the IEPs (rather than just the IHO's decision on that point), the cited Guidelines provide only that written notice has to be provided when the paraprofessional is "responsible" for services, but that in all other cases, the supervisor is "100% responsible" – thus, written notice is limited to cases in which a paraprofessional is "responsible" for the student's instruction. (Doc. 100, Ex. 7 at 2). There is no indication in the record, and Plaintiffs have produced no additional evidence, that Ms. Grandsart's supervision of Ms. Lehnert's work with T.G. deviated from this standard of "100%" responsibility, and so there was no duty under the Guidelines to inform Plaintiffs in writing of Ms. Lehnert's work.

adequate vocational evaluation and services, the IHO ordered Defendant to provide compensatory education to T.G. in those areas. (AR 345). Plaintiffs now argue that this order was not sufficient because "it contained arbitrary and unexplained choices of the amount, duration and intensity of compensatory services." (Doc. 100 at 4). Plaintiffs complain that the IHO's order was insufficiently supported by a factual analysis, and therefore "arbitrary and capricious," and they suggest that the Court order compensatory education based on their experts' opinions of what T.G. needs. (Doc. 100 at 31).

The Court notes that Plaintiffs' cited cases on this issue concern courts' ability to award compensatory education *where they have found an IDEA violation* – here, the Court finds that the IHO's substantive determinations were reasonable and should be affirmed, and therefore finds no violation for which it should order compensatory education. This Order & Opinion concerns whether the IHO's compensatory education order was appropriate, but Plaintiffs do not cite a standard governing an IHO's grant of compensatory education. Even if an IHO's order of compensatory education must meet the same standard as a court's order of the same, the question is subject to a difference of opinion between the circuits, as noted by the Northern District of Illinois in *Petrina W. v. City of Chicago Public School Dist. 299*; the Seventh Circuit does not appear to have yet given any guidance as to how a compensatory education award should be calculated. 08 CV 3183, 2009 WL 5066651, *3-4 (N.D. Ill. Dec. 10, 2009). The Northern District of Illinois, following the District of Columbia, Sixth, Ninth, and Eleventh Circuits, adopted the rule that "compensatory education should be 'reasonably calculated to provide the

educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.'" *Id.* at *5 (quoting *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 523 (D.C. Cir. 2005)). The Court finds that this rule, as explained by the Northern District, is more in keeping with the purposes and methods of the IDEA than is the rule promulgated by the Third Circuit,[21] but reiterates that in this, as in the other challenges to the IHO's determinations of educational policy, the Court defers to the IHO's opinion so long as it is reasonable and supported by the evidence.

The Court finds that the IHO's order of compensatory education was appropriate, being reasonably calculated to provide T.G. the educational benefits she would have received if Defendant had provided her with appropriate reading, writing, and vocational services during her ninth grade year. The IHO ordered Defendant to provide at least two hours each week of reading instruction in a research based multisensory approach,[22] through the entirety of the 2009-2010 school year; the instruction was to take place outside of regular school hours. In writing, the IHO required at least an hour a week of specially designed writing

---

[21]   The Third Circuit's standard is that a "disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." *Petrina W.*, 2009 WL 5066651, *3 (quoting *Mary T. v. School Dist. Of Philadelphia*, 575 F.3d 235, 248 (3rd Cir. 2009)).

[22]   Dr. Lorber had recommended the Lindamood Bell approach in his report, but his testimony revealed that he also believed a similar multisensory approach would be appropriate, as well; the IHO's order specifically required Lindamood Bell, Wilson, or a similar multisensory approach. (AR. 327, 345).

instruction, in addition to the classroom instruction T.G. was already to receive.[23] As for vocational services, the IHO ordered Defendant to retain a certified vocational evaluator[24] to administer a vocational evaluation, then to convene an IEP meeting to draft appropriate transition goals for T.G. based on the evaluation; Defendant was also ordered to provide vocational counseling if found necessary by the evaluator. (AR 345).

Plaintiffs' arguments ask the Court to second-guess the IHO's calculation of the appropriate level of compensatory relief, and to rely solely on their experts' opinions. As noted elsewhere in this opinion, throughout her decision the IHO carefully considered the evidence put on by both Plaintiffs and Defendant, including Plaintiffs' experts' opinions. This holds true for the compensatory education order: each of the IHO's three requirements included the suggestions of Plaintiffs' experts. She demanded the same type of reading and writing programs suggested by Dr. Lorber, and required Defendant to employ James Boyd or someone comparable, to perform the vocational evaluation he had suggested. (AR 345). Plaintiffs now offer no arguments that undermine the IHO's order of compensatory education, but merely ask for more than she ordered, based on the same evidence that the IHO already considered. The Court finds that the IHO's order is sufficiently detailed and reasonably calculated to provide T.G. the educational benefits she should have received, and finds no reason to overturn it.

---

[23]    The IHO's order referred specifically to Dr. Lorber's report in specifying the type of writing program Defendant should use. (AR 345).

[24]    The IHO suggested James Boyd, the parents' vocational expert, or someone with comparable qualifications. (AR 345).

### C.   IHO's finding that Defendant was not required to reimburse Plaintiffs for the private evaluations they obtained

The IHO also found that Defendant was not required to reimburse Plaintiffs for their private evaluations of T.G., because Defendant's evaluations were appropriate. (AR 342-44). Plaintiffs claim that this finding was "an error of law."

A school district must conduct evaluations of a student in order to assist with the IEP process. A school district need not pay for parents' private evaluations of their child unless the parents disagree with the school district's evaluation and request a private evaluation in writing. 34 C.F.R. 300.502(b); 23 Ill. Adm. Code 226.180. In addition, if a district files a due process complaint requesting a hearing, and shows "that its evaluation is appropriate," it is not required to reimburse the parents for a private evaluation. 34 C.F.R. 300.502(b)(2)(i). Defendant evaluated T.G. for speech and language, occupational therapy, and assistive technology. Plaintiffs obtained competing private evaluations with Ms. Ontiveros, Ms. Marshall-Kramer, Don Dalton (Plaintiffs' assistive technology consultant), and Dr. Lorber, and sought reimbursement from the IHO. Defendant filed a due process complaint, and argued before the IHO that its evaluations were proper; the IHO found in Defendant's favor.

In support of their argument for reimbursement for the evaluations by Ms. Ontiveros, Ms. Marshall-Kramer, and Mr. Dalton, Plaintiffs argue that the IHO "ignored substantial evidence" that Defendant's evaluations were in fact inappropriate.[25] (Doc. 100 at 3). They assert that Defendant's evaluations "lacked

---

[25]   Plaintiffs also claim that the IHO "misapplied the statutory burden of proof which requires the District to prove its evaluations appropriate," but there is no

written recommendations, accurate deficit levels, baseline data needed for developing measurable goals, and/or needed assessment procedures; or failed to include any normed, objective testing or failed to test key deficit areas for which the District had clear signs of suspected disabilities." (Doc. 100 at 3). These arguments are considered for each of the evaluations in turn, and then the Court turns to Plaintiffs' separate arguments for the evaluation by Dr. Lorber.

### 1.    Speech and Language Evaluation

Ms. Grandsart, Defendant's Speech Language Pathologist, administered T.G.'s speech and language evaluation in November 2006. The IHO found that Ms. Grandsart's evaluation was appropriate, as it was "comprehensive and reasonably chosen to identify T.G.'s speech and language needs," and "provided objective insight into T.G.'s skill levels in the areas of oral/motor and articulation, receptive and expressive language, as well as auditory perception, reasoning, and processing." (AR 342). She further found that Ms. Ontiveros' evaluation "was no more thorough," as Ms. Ontiveros' testimony revealed Ms. Grandsart's evaluation to have been "more in depth" than hers, and that their results were mostly consistent. (AR 342). The primary distinction between Defendant's results and Ms. Ontiveros' related to T.G.'s expressive and receptive language: they administered different tests and came to different results, but Ms. Ontiveros was not familiar with the test administered by Ms. Grandsart. (AR 337). The only flaw with Defendant's

---

indication in the IHO's decision that she misstated or misunderstood that Defendant bore the burden of proving that its evaluations were appropriate. Indeed, it does not appear in her opinion that the burden of proof was a dispositive issue – the IHO makes no statements indicating this, such as "Plaintiffs have failed to prove…" The mere fact that Plaintiffs disagree with the IHO's conclusion does not mean that the IHO misapplied the law.

evaluation identified by the IHO was that Ms. Grandsart did not include written recommendations, but this was not a problem because Ms. Grandsart shared her recommendations with the team orally. (AR 342). About Ms. Ontiveros' report as a whole, the IHO determined that the credibility of her report was undermined by her analysis of areas that were outside of her expertise, including the "appropriateness of various academic goals, social work services and occupational therapy." (AR 336-37).

Plaintiffs complain that the IHO's determination that Ms. Grandsart's evaluation was appropriate is erroneous, citing to Ms. Ontiveros' report, which they claim undermines Ms. Grandsart's evaluation; they assert that the IHO "ignored the contrary evidence." (Doc. 100 at 9-10). On the contrary, this report does not itself show that the IHO was unreasonable in finding that Ms. Grandsart's report was appropriate, as it is merely a statement of Ms. Ontiveros' opinions about Ms. Grandsart's report. Plaintiffs complain that Ms. Grandsart's evaluation "applied the global presumption," but do not explain why this would be *per se* erroneous; they indicate that Ms. Ontiveros' report may have been somewhat more detailed and came to a different conclusion in one area, but, again, do not indicate why this means that Ms. Grandsart's was inappropriate. Finally, Plaintiffs state that Ms. Grandsart's evaluation lacked "baseline data,…goal and service recommendations," and that the IHO "ignored testimony by Ms. Ontiveros that baseline data is important for [a speech and language] evaluation." (Doc. 100 at 11).

As discussed above, the Court defers to the IHO's expertise in the realm of educational policy so long as it is not "strongly convinced that the order is

erroneous." *Alex R.*, 375 F.3d at 612. Here, the IHO relied on Ms. Ontiveros'

testimony that she mostly agreed with Ms. Grandsart's conclusions, and the

hearing transcript bears out this characterization of her testimony. Ms. Ontiveros'

only disagreements with Ms. Grandsart were that she identified two problems of

speech articulation that Ms. Grandsart did not specifically mention, that they came

to different results about T.G.'s expressive and receptive language, and that the

report did not include written recommendations. (AR 1389-96). The IHO properly

dealt with her testimony on these issues. The IHO correctly noted that Ms.

Ontiveros admitted that Defendant used different, and more comprehensive tests,

and so came to somewhat different conclusions; Ms. Ontiveros also testified that she

was not familiar with the test used by Ms. Grandsart to measure T.G.'s expressive

and receptive language skills, and so her testimony regarding that test was less

useful. (AR 1390-1395). The IHO noted, as did Ms. Ontiveros, that Ms. Grandsart's

report did not include written recommendations, but the IHO determined that any

harm was cured by Ms. Grandsart reporting them orally to the IEP team. This is

not an unreasonable determination.

　　　　Further, it was not unreasonable for the IHO to find that Ms. Ontiveros'

credibility was somewhat diminished by her willingness to opine as to areas outside

her own expertise, and so to reject her testimony on those other areas.[26] Defendant

put on evidence that Ms. Grandsart's evaluation was appropriate, and, in the IHO's

opinion, neither Ms. Ontiveros' report nor her testimony undermined this evidence

in a significant way. Plaintiffs point to no other evidence in their argument against

---

[26]　　For the same reason, neither the IHO nor the Court relies on Plaintiff's
evidence from Ms. Ontiveros regarding areas other than speech and language.

the IHO's determination. The Court thus will not reverse the IHO's reasonable determination that Defendant's speech and language evaluation of T.G. was appropriate.

### 2.    Occupational Therapy Evaluation

The IHO also found that Ms. Armstrong's occupational therapy evaluation of T.G. on behalf of Defendant was appropriate. (AR 342-43). The evaluation "measured T.G.'s skills in the areas of visual-motor integration, visual perception and motor coordination," and "included a comprehensive functional assessment that measured the degree to which T.G. could perform tasks encountered in the classroom setting." (AR 342). She noted that Ms. Marshall-Kramer's private evaluation concluded, as did Ms. Armstrong's evaluation, "that T.G. has severe deficits in visual perception and fine motor concentration," but Ms. Marshall-Kramer's recommendation of direct occupational therapy was undermined by the fact that she "did not observe T.G. at school and did not base her recommendation on T.G.'s ability to function in the classroom setting," so she could not dispute Ms. Armstrong's conclusion that "T.G.'s skills in the classroom were functional." (AR 335, 343).

Plaintiffs argue that the IHO "missed the evidence of key deficiencies, and discounted the Parent's [*sic*] private [occupational therapy] evaluator because she was a clinician[,]without explanation." (Doc. 100 at 16). They rely for the first point on Ms. Marshall-Kramer's findings of deficiencies not specifically noted by Ms. Armstrong, and her recommendation of direct occupational therapy services. The IHO explained that she gave less weight to Ms. Marshall-Kramer's opinion and

evaluation because Ms. Marshall-Kramer did not observe T.G. in school. As the Seventh Circuit noted in *Heather S.*, trained educators and those who observe a student in school are better equipped to make educational judgments than clinicians. 125 F.3d at 1057.

The only flaw Plaintiffs identify with Ms. Armstrong's evaluation method was that one of the tests was designed for students up to 12 years old, while T.G. took it when she was 14. The IHO noted Ms. Armstrong's testimony that she believed that the test would still be helpful; it was not unreasonable for the IHO to rely on this, and Plaintiffs have put on no evidence that the test's results were actually erroneous. (AR 342). It was also not unreasonable for the IHO to find that Ms. Armstrong's evaluation and recommendations as a whole were appropriate, as she observed T.G. in school, and as Ms. McCartney (Defendant's certified occupational therapy assistant), who had worked with T.G. since second grade, agreed that T.G. was able to function in school. (AR 330-31, 342). The IHO reasonably chose to prioritize T.G.'s school-related physical abilities, which is an educational policy judgment the Court will not disturb. The fact that Ms. Marshall-Kramer found other deficiencies and recommended more services does not render this judgment unreasonable, as the IHO gave considered reasons for finding otherwise. The Court finds that the IHO's determination that Ms. Armstrong's evaluation was appropriate is reasonable and supported by the record.

### 3.   Assistive Technology Evaluation

Ms. Conklin, of Infinitec Assistive Technology Coalition Center, performed an assistive technology evaluation of T.G. for Defendant, and the IHO concluded that it

was appropriate, given that she consulted with the IEP team, observed T.G. in the classroom, and had T.G. attempt using several assistive technology products. (AR 343). Mr. Dalton, Plaintiffs' consultant, recommended a different product than the ones Ms. Conklin recommended, but did not indicate that the product she recommended was inappropriate; the IHO found that though Defendant ultimately chose the product recommended by Mr. Dalton, this fact alone did not render Ms. Conklin's evaluation inappropriate. (AR 343). Plaintiffs make no specific arguments against the IHO's determination that the assistive technology evaluation was appropriate. The Court has reviewed the IHO's decision on this point, and has determined that it was reasonable and supported by the evidence.

### 4. Neuropsychological Evaluation

Finally, Plaintiffs sought reimbursement for the neuropsychological evaluation by their private evaluator, Dr. Lorber; Plaintiffs had argued before the IHO that they were entitled to reimbursement because Defendant used the results of Dr. Lorber's evaluation rather than conducting its own, citing to an ISBE policy that a district must reimburse parents when it relies on a private evaluation instead of its own. The IHO denied their request both because Plaintiffs had failed to disclose their request for reimbursement in their due process complaint or to make a formal written request for an independent evaluation, which is required by specific federal regulations and Illinois statutes, and because they chose to have Dr. Lorber evaluate T.G. and attend meetings with them without allowing Defendant to conduct an evaluation before he performed his, applying ISBE policy. (AR 344). The

Court finds that this issue presents one question of law, but also one question of the interpretation of the ISBE's policies.

The IHO's primary reason for denying Plaintiffs reimbursement for Dr. Lorber's evaluation was that they had failed to disclose their request for reimbursement in their due process complaint or to make a formal written request for an independent evaluation, which is required by specific federal and Illinois regulations. 34 C.F.R. 300.502(b)(1); 23 ILL. ADM. CODE 226.180a. Plaintiffs did not present their request for reimbursement in the due process complaint or make the required formal request for an independent evaluation; both failings require the denial of their claim. Indeed, 34 C.F.R. 300.502(b)(1) and 23 ILL. ADM. CODE 226.180a provide for reimbursement if the parents *disagree* with the district's evaluation – here, there had not yet been an evaluation with which to disagree. Plaintiffs' procedural failure alone justifies the denial of reimbursement.[27]

---

[27]     The IHO also addressed Plaintiffs' argument based on the ISBE's policy of reimbursement where the district chooses to rely on the parents' evaluation rather than conducting its own. (AR 343 (citing ISBE Special Education Policies and Procedures, Section X, Private Evaluations and Independent Evaluations at Public Expense, D., p. 74)). Neither party has provided the Court with a copy of these Policies. However, as the law specifically requires the sort of notice by the parents discussed above, the fact that ISBE policy may provide for reimbursement in situations other than where the district's evaluations are inadequate does not negate those procedural requirements; Plaintiffs arguments under the ISBE policy are thus irrelevant. Notwithstanding the contents of the ISBE's policy, Plaintiffs were still required by the applicable regulations to disclose their request for reimbursement.

Taking Plaintiffs' and the IHO's characterization of ISBE policy at face value, the Court finds that the IHO's application of it was correct. Because Plaintiffs did not allow Defendant to conduct a neuropsychological evaluation until after Dr. Lorber had evaluated her, Defendant relied on Dr. Lorber's evaluation rather than doing a second evaluation itself: Dr. Lorber's results were consistent with Defendant's past evaluations of T.G., and several of the tests would have given invalid results if given to T.G. so soon after Dr. Lorber administered them. (AR

### D.    IHO's compliance with procedural requirements

Plaintiffs contend that the IHO violated a number of procedural requirements under IDEA, its regulations, and Illinois state educational law by issuing an order "clarifying" her decision at Defendant's request. The Court finds that, insofar as there were no procedural errors sufficient to invalidate the IHO's order as a matter of law, or to undermine the Court's confidence in the IHO's decision.

### 1.    IHO's Clarification

The May 2009 hearing before the IHO dealt with the period from May 2005 to May 2007, and the IHO's decision was issued in July 2009. In that decision, the IHO ordered Defendant to hold an IEP meeting and provide specific reading, writing, and vocational services to T.G. By the time of the decision, Defendant had already held an IEP meeting, in September 2008, and was due to hold another by September 3, 2009. After the decision was issued, Defendant sought the IHO's

---

344). The IHO cited these facts in concluding that Plaintiffs could not "credibly argue that the District *chose* to rely on Dr. Lorber's evaluation in lieu of its own." (AR 344 (emphasis in original)). By insisting on having Dr. Lorber evaluate T.G. before allowing Defendant to do so, Plaintiffs created a situation in which Defendant was unable to conduct its own evaluation and had to rely on Dr. Lorber's alone. *See* 34 C.F.R. 300.502(c) (district must consider private evaluations obtained by parents). This was especially shown by Mr. Muskopf's testimony that several of the tests Dr. Lorber performed would have given invalid results if re-administered within such a short time frame as would have been required for Defendant to re-evaluate T.G. in time for the triennial review. (AR 344). Again, Plaintiffs were required to comply with the procedural notice requirements set out in federal and state regulations, but they also were not substantively entitled to reimbursement under ISBE policy as explained by the IHO.

advice as to whether the September 2008 IEP satisfied the decision, since it was developed after the time period addressed by the decision, but before the hearing and decision. Plaintiffs argue that her advice on this question was "illegal," and that the IHO was without jurisdiction to issue it. As Defendant points out, Plaintiffs cite no law supporting their argument that this clarification was "illegal" or that it reduced the relief granted to Plaintiffs.[28] Indeed, 105 ILCS § 5/14-802a(h) specifically states that the IHO will "retain jurisdiction for the sole purpose of considering a request for clarification of the final decision submitted in writing by a party to the impartial hearing officer within 5 days after receipt of the decision." Here, the decision was issued on July 17, 2009, and Defendant sent its request for clarification on July 22, 2009. (AR 300-01). A mere three business days elapsed between the decision and the request for clarification, placing the request squarely within the statute.[29]

---

[28]    Plaintiffs cite to *Board of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307 (6th Cir. 2007), but do not indicate how this case supports their argument that the IHO's clarification of her order is "illegal," or even cite to a specific page within that case; the Court has reviewed the case and finds nothing applicable to this issue. Likewise, they cite to 105 ILCS § 5/14-8.02a(i), which merely provides for an appeal of the agency's decision. Finally, they note 23 ILL. ADM. CODE 226.670 and 226.675. Section 226.670 merely notes that the bases and timelines for decisions are governed by 34 CFR 300.513 and 105 ILCS § 5/14-8.02a(h), that they must be sent by certified mail to the parties, and that they must be translated in the parents' native language; section 226.675 provides that the ISBE is to monitor compliance with the IHO's decision.

[29]    Plaintiffs also gesture towards a complaint that the request for clarification was faxed to the IHO, but mailed to Plaintiffs, so that the IHO received it earlier than did Plaintiffs. The statutes and regulations do not prohibit the parties from using a faster method of delivering their request than the regular mail, so long as they do mail the request, as well. Plaintiffs received the request on July 24, still within the five-day period. (AR 306).

Plaintiffs also argue that this clarification (1) illegally ruled that the District was in compliance with the IHO's decision, (2) that the IHO illegally relied on additional evidence, the September 2008 IEP, in issuing her clarification, and (3) that it illegally reduced the relief granted to them in the IHO's decision; they also argue that they were not given the opportunity to "confront and cross-examine" the September 2008 IEP. The IHO's clarification did two things: it found that the September 2008 IEP's provision for writing and reading instruction met the requirements of her decision, and allowed the District, since it had held the September 2008 IEP meeting and was due to hold another by September 3, 2009, until September 3, 2009 to hold the next meeting. (AR 305, 309).

As to the assertion that the IHO did not have the power to rule that the District was in compliance with her decision, it is true that the determination of whether a party has complied is entrusted to the Illinois State Board of Education ("ISBE") under 23 Ill. Adm. Code 226.675; the IHO's statement that Defendant's actions satisfied her order was thus not binding. However, Plaintiffs cite to no authority indicating that an IHO is prohibited from opining that the course of action taken by a district would meet her expectations under her decision, though that opinion would of course not be binding on the ISBE. If the IHO had stated that Defendant's actions up to that point were insufficient, Defendant would then have had the chance to complete its compliance with the decision, rather than choosing between wastefully repeating its actions in order to ensure exact compliance or risking an ISBE finding of non-compliance by resting on its previous actions. There is no indication that the IHO was prohibited from rendering this sort of opinion in

order to assist Defendant's compliance. In this same vein, as the IHO's opinion regarding Defendant's compliance was not binding, Plaintiffs suffered no harm from the IHO's looking to additional evidence for information in rendering such an opinion, though they did not have the opportunity to respond to this evidence, which had previously been excluded as outside the timeframe of the IHO's hearing.

The only arguable change to the decision was to allow Defendant more time to hold their next IEP meeting.[30] The decision had required an IEP meeting to be held within two weeks of the decision (by the end of July 2009), but Defendant sought and was granted until September 3, 2009, to hold the meeting, as Defendant had already held a September 2008 meeting and was scheduled to hold another by September 3, 2009, when district staff would be available. Plaintiffs have cited no authority on the issue of whether, how, and when an IHO may give a district more time to comply with her order. Given this absence of legal guidance, and no prejudice to Plaintiffs resulting from the slight delay,[31] the Court finds that, to the

---

[30]   Any other statements in the clarification order were merely non-binding opinions as to Defendant's substantive compliance with the IHO's order for additional reading and writing instruction; they did not change the requirement that Defendant comply with the original order as written, but merely opined that Defendant's actions would comply.

[31]   Indeed, the Court does not see how Plaintiffs could have been prejudiced by the change in the IEP meeting date from July 31 to September 3, as any changes to the IEP would not have taken effect until the new school year began in September 2009 – a July meeting would have given them no benefit over a September 3 meeting.

Plaintiffs appear complain that this extension of time "ruled no further IEP Meeting was required, effectively deleting the Order, [which] harmed the Parents by denial of the right to participate in the formulation of FAPE." (Doc. 110 at 4). Setting aside the fact that Plaintiffs appear to raise this argument for the first time in their Reply brief, which is not the appropriate place to raise new arguments, there is no indication that this is true, or that, if the Parents chose not to attend or participate in the September 3 IEP meeting, it was a result of the IHO's or

extent the IHO improperly "changed" her order in this way, such error was harmless.

### 2.     Delegation to IEP team

Finally, Plaintiffs contend that the IHO's final order impermissibly "delegated" to the IEP team the responsibility to choose the appropriate reading and writing programs for T.G. In her decision, the IHO ordered Defendant to "convene an IEP meeting to create a goal or goals to address T.G.'s reading deficits using a specially designed, multisensory reading approach such as the Lindamood Bell or Wilson method of instruction. It will be the team's decision whether the goal or goals should address reading comprehension, decoding or both." (AR 345). As to writing, the IHO ordered that "The instructions should utilize an approach such as The Power Writing Program, or Three Steps to Powerful Writing,…or another specially designed approach selected by the team." (AR 345).

In support of the claim that the IHO's "delegation" was inappropriate, Plaintiffs cite to *Board of Educ. of Fayette County, Ky. v. L.M.*, a Sixth Circuit case holding that an IHO could not give the IEP team, which includes school district members, the discretion to reduce or terminate the compensatory education ordered by the IHO. 478 F.3d 307, 317 (6th Cir. 2007) (citing *Reid ex rel. Reid v. Dist. of*

---

Defendant's actions. Indeed, the September 3 IEP meeting had not taken place when the IHO issued her order, so it is factually incorrect to say that the clarification "ruled no further IEP Meeting was required, effectively deleting the Order." This is not true: the clarification merely moved the meeting back by a few weeks; it still had to be held pursuant to the Order, and had to provide the services required by the Order. Plaintiffs have also presented no logical argument that the extension of time prevented their participation in the IEP meeting.

*Columbia*, 401 F.3d 516, 526-27 (D.C. Cir. 2005)).[32] T.G.'s case, though, is readily distinguishable from *L.M.*, as the IHO here merely allowed the IEP team, which statutorily includes T.G.'s parents, to determine which aspects of reading it would emphasize, and which reading and writing programs it would use, as limited by the examples given – it did not allow the team to reduce or terminate the ordered reading instruction at its own discretion. There is thus no violation in granting this limited flexibility to the IEP team.

## VI.   Prevailing party status and request for attorney's fees

Plaintiffs' request for attorney's fees constitutes the third count of their Third Amended Complaint. (Doc. 45 at 30-32). They assert that, because the IHO found that Defendant had failed to provide a FAPE to T.G. during her ninth grade year and ordered specific compensatory education as a remedy, they are "prevailing parties" entitled to attorney's fees under the IDEA. (Docs. 101 at 6 & 107 at 36-39). The IHO was not empowered to determine whether Plaintiffs were the prevailing party, but opined that Defendant had "largely complied with the requirements of FAPE on T.G.'s behalf." (AR 346). The Court finds that Plaintiffs are technically "prevailing parties," but their success is so minimal in the context of their other goals in this case that they are not entitled to attorneys' fees.

---

[32]    Once again, Plaintiffs have failed to cite to a particular page of this case, or to analyze and apply it to their argument, leaving it to the Court to puzzle out their argument.

The Seventh Circuit has adopted the Supreme Court's *Farrar v. Hobby* test to determine when a party is entitled to attorney's fees in the IDEA context. *Linda T. ex rel. William A. v. Rice Lake Area School Dist.*, 417 F.3d 704, 707-08 (7th Cir. 2005) (citing 506 U.S. 103, 115 (1992)). Under this rule, "a plaintiff who formally but only nominally prevails may be denied recovery of attorneys' fees." *Id.* (citing *Farrar*, 506 U.S. at 115). As explained in *Farrar*, a plaintiff "prevails" when he obtains "actual relief on the merits," which "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." 506 U.S. at 111-12. Here, it does appear that the IHO's determination that Defendant's failure to provide adequate reading, writing, and vocational services for one school year, and her resulting order of compensatory education in those areas during the 2009-2010 school year materially altered the legal relationship between Plaintiffs and Defendant, in that Defendant was then obligated to provide specific services that it had not already provided, to T.G.'s benefit.[33]

However, in the context of Plaintiffs' goals in their due process complaint and their appeal before this Court, Plaintiffs' achievement is de minimis. Plaintiffs sought a finding that Defendant denied the parents' procedural rights, a finding that T.G.'s IEPs for each of three school years were both inadequate and improperly implemented, a finding that Defendant failed to provide both specially designed

---

[33]    It could be argued, however, that this order did not "alter" the legal relationship, as Defendant was merely ordered to provide the services that it was already required, but failed, to provide in the past. The order did not provide anything more than that which T.G. was previously entitled to – appropriate reading, writing, and vocational services. She did not receive an additional benefit.

instruction and appropriate related services, reimbursement for four private evaluations, and an order of substantially more compensatory education. What they received was an order that, for one school year, Defendant failed to provide a FAPE in three areas, and a specifically-tailored order of compensatory education limited to addressing that deficiency. The Court finds instructive the case of *Monticello Sch. Dist. No. 25 v. George L.*, in which the appellate court upheld a district court's determination that the parents' success was de minimis in the context of their overall claim, where they received "fairly significant changes" to the student's IEP and reimbursement for his attendance at a private school, because they had failed to obtain a determination that the student should be placed at the private school full-time. 102 F.3d 895, 908 (7th Cir. 1996).

Here, in the context of Plaintiffs' very ambitious goals, the IHO's finding of a partial denial of a FAPE and limited compensatory education was only a de minimis victory. As such, Plaintiffs are not entitled to an award of attorneys' fees.

## VII. Permanent injunction

Plaintiffs' Amended Complaint requests a permanent injunction ordering Defendant to comply with the IHO's decision. Under the Illinois Administrative Code, the ISBE has the authority to "review the [IHO's] decision and monitor compliance by the parties with the terms of the decision." 23 ILL. ADM. CODE 226.675. On August 31, 2009, the ISBE found Defendant to be in compliance with the IHO's decision, and closed the case. (AR 387). Plaintiffs assert that the "Court should not give due weight to the rubber stamp of the ISBE in asserting the District has complied because it is based on the illegal ruling of the IHO." (Doc. 108 at 12).

However, Plaintiffs cite no evidence for their assertion that the ISBE did not independently assure itself of Defendant's compliance with the IHO's decision, and there is no basis, such as a reference in its letter of compliance to the IHO's opinion that Defendant had complied, to assume that the ISBE acted improperly and "rubber stamped" that opinion. The Court will not make this assumption of wrongdoing merely on Plaintiffs' bald assertion that the ISBE merely "rubber stamped" the IHO's opinion. Plaintiffs present no evidence to undermine the ISBE's determination, or legal authority for the Court to overturn it.

A permanent injunction can only issue if the plaintiff has succeeded on the merits of his claim. *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996) (citing *Amoco v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987); *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir. 1992)) ("A permanent injunction (as opposed to a preliminary injunction or a temporary restraining order) is not provisional in nature, but rather is a final judgment. …Thus, when the plaintiff is seeking a permanent injunction…the issue is…whether he has in fact succeeded on the merits."). As the relevant administrative agency has determined that Defendant complied with the IHO's decision, and Plaintiffs have provided no basis for the Court to question that finding, they cannot succeed on their substantive argument that Defendant has failed to comply with the IHO's decision, and thus the Court cannot grant them an injunction requiring Defendant to comply.

Finally, Plaintiffs request, as the first count of their Third Amended Complaint, a permanent injunction and other relief under § 1983 for other alleged

violations "the 5th and 14th Amendments to the U.S. Constitution, …other federal statutes, and related provisions of the Illinois Constitution and statutes." (Doc. 45 at 23). Nowhere in their Motion for Summary Judgment or Response to Defendant's Motion for Summary Judgment do they mention this claim for relief, or elaborate on their non-IDEA claims supposedly arising under the federal and Illinois constitutions and other statutes. The Court therefore assumes that the § 1983 count was included as a means to ensure that Plaintiffs, if they prevailed on the merits of their IDEA appeal, obtained the permanent injunction and reimbursement they sought, though the Court finds no indication in the caselaw that such relief cannot be granted under the IDEA alone. As the Court now rules against Plaintiffs in their IDEA appeal, no injunction against Defendant is appropriate, and, as explained above, Plaintiffs are not entitled to either reimbursement or attorney's fees.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 95) is GRANTED, and Plaintiffs' Motion for Summary Judgment (Doc. 100) is DENIED. IT IS SO ORDERED.

CASE TERMINATED.

Entered this 27th day of January, 2012.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge